J-A28032-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| M&G, LLC | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| SERVANT INVESTMENTS FUND | : | |
| (ALLIANCE RIBS), LLC, SERVANT | : | |
| INVESTMENTS, LLC, SERVANT | : | No. 572 WDA 2019 |
| INVESTMENTS HOLDINGS, LLC, | : | |
| ALLIANCE DEVELOPMENT GROUP, LLC | : | |
| A/K/A ALLIANCE DEVELOPMENT | : | |
| GROUP HOLDINGS, LLC, DAMONS | : | |
| MANAGEMENT GROUP, LLC, WILLIAM | : | |
| J. BURK, CARL HOWARD, GARY | : | |
| REINERT SR., PIPA GROUP, LLC A/K/A | : | |
| PIPA LLC, THOMAS TRIMM, DAVID M. | : | |
| LAMATRICE, CAPITAL PACIFIC, LLC, | : | |
| FLORIDA PETE, INC., CHRISTOPHER | : | |
| PETERS, TONY MOSES, MOSES | : | |
| ENTERPRISES, J. MICHAEL SABATINI | : | |
| AND KIM SABATINI, JOHN J. | : | |
| NALIPINSKI AND FRANCES | : | |
| NALIPINSKI, SPERRY VAN NESS, | : | |
| MARK CUNNINGHAM, AND CRG | : | |
| INVESTMENT. | : | |
| | : | |
| | : | |
| APPEAL OF: MARK CUNNINGHAM AND | : | |
| COMMERCIAL REALTY GROUP, INC. | : | |
| A/K/A CRG INVESTMENTS. | : | |

Appeal from the Judgment Entered April 15, 2019
In the Court of Common Pleas of Allegheny County Civil Division at No(s):
No. G.D. 09-20665

BEFORE:  OLSON, J., MURRAY, J., and McCAFFERY, J.

MEMORANDUM BY McCAFFERY, J.:                    **FILED FEBRUARY 22, 2021**

Appellants Mark Cunningham and Commercial Realty Group, Inc. a/k/a CRG Investments ("Cunningham" and "CRG"; collectively, "Appellants") appeal from the April 15, 2019 Judgment of the Allegheny County Court of Common Pleas, entering judgment in favor of M&G LLC and against Appellants in the amount of $2,404,488.97.[1]  Appellants' Brief at 4-5.

Appellants bring the following claims on appeal:

1.     Are M&G's claims for intentional misrepresentation and failure to disclose/concealment barred by Pennsylvania's two-year statute of limitations where M&G did not sue [Appellants] until August 2010, more than two years after M&G's claims accrued no later than October 2007?

2.     Was the evidence insufficient to establish M&G's claims for intentional misrepresentation and failure to disclose/concealment where M&G suffered no loss from the sale of its San Rafael [Office], and where it did not rely on any representation or omission by [Appellants] in purchasing the Waterfront Property?

3.     In the alternative, should the verdict be reduced because (1) the trial court failed to apportion liability to joint tortfeasors that had settled with M&G before trial and mold its verdict to account for those settlements; and (2) certain elements of the

_____

[1] Appellee Carl Howard (Howard) has filed a succinct brief in which he observes that Appellants, who asserted a cross-claim against him as a principal in a parent company of Damon's Restaurant, a tenant in the investment property at issue, allowed any claim against him to fall by the wayside at trial.  Howard Brief at 1-3.  He argues that any argument that the trial court erred in failing to apportion liability among joint tortfeasors is waived for failure to abide by Pa.R.A.P. 2116 and 2119(a), an argument we address *infra*.  **Id.**  His involvement in this litigation is otherwise minimal, and after oral argument, Appellants, M&G, and Howard reached a stipulation to dismiss with prejudice claims specific to Howard (and only Howard).  **See** Stipulation, 12/18/20, at 3.  Howard does note in his brief that the trial court erroneously recounted that "all other defendants [save CRG and Cunningham] have either settled with M&G or declared bankruptcy."  Trial Ct. Op. at 1, n.1.  Howard has done neither.  Howard Brief at 2, n.2.

trial court's damages calculation are based on a clear misapprehension of the record?

4.    Did the trial court err by finding CRG liable for claims that M&G never asserted against Cunningham or CRG or had abandoned?

Appellants' Brief at 6-7.

The trial court recounted the facts as follows:

Plaintiff M&G, LLC (hereinafter, "M&G") is owned by Michael Flynn (Flynn) jointly with his wife Gail Flynn.  M&G was created to hold real estate investments that would generate income and allow Flynn and his wife to retire.  Remaining defendants are Mark Cunningham (Cunningham) and CRG Investments (CRG).  [Cunningham] is a California-licensed real estate broker.  To provide some context to the relationship, Flynn and Cunningham had been friends for nearly a decade.  At times Flynn had represented Cunningham as his attorney and Cunningham considered Flynn a mentor and advisor.

M&G owned office space in San Rafael, California (San Rafael Office) where Flynn leased and operated his law firm.  In a casual conversation concerning Flynn's firm and retirement, Cunningham proposed the idea of selling the San Rafael Office. With how "hot" the California market was, Cunningham told Flynn [he] would be able to get millions on the sale and increase the monthly income generated from the property from $50,000 to $100,000. [ ] With the potential tax liability Flynn faced from the sale, the only avenue he considered was an IRS § 1031 exchange transaction[2] (1031), and this was ultimately the plan that was put into action.  Flynn relied on Cunningham throughout the 1031 transaction and Cunningham even admitted that he owed M&G a fiduciary duty throughout the transaction.  Additionally, Cunningham admitted that he was M&G's broker.  However, despite these admissions, Cunningham also testified that because

---

[2] IRS Section 1031 provides a deferral of capital gains on the sale of real property.  It allows a taxpayer to postpone paying tax on the capital gain if the proceeds are reinvested in similar property as part of a qualifying like-kind exchange.  26 U.S.C. § 1031.

there "was no representation agreement on the buy side" he was not exactly Flynn's broker.

The original listing price for the San Rafael Office was 2.45 million dollars, and eventually [the office] went under contract to sell for 2.35 million to an undisclosed seller. Under 1031, M&G had 45 days after the sale to find a replacement property or incur the tax consequences of the capital gain. Cunningham and Flynn reviewed potential properties to use for the transaction and identified two potential properties. Ultimately, M&G[ ] contracted to purchase a riverfront property in West Homestead, Pennsylvania (Waterfront Property) for 2.28 million dollars. This property included an operating Damon's restaurant.

After the purchase, M&G discovered that the Waterfront Propert[y's] tenant, subtenant, and guarantors were not financially secure, and each was losing money on the restaurant operations. One of the subtenants, Damon's Management Group, was replaced by PIPA Group, LLC (PIPA) as subtenant and operator of the restaurant. PIPA paid rent from October 2007 until January 2009 when it vacated the premises. M&G started experiencing financial trouble once PIPA stopped paying rent. M&G was unable to attract another buyer or restructure its mortgage. As a result, the mortgage lender agreed to accept the deed to the Waterfront Property in lieu of foreclosure. The Waterfront Property was granted to the designee of lender for [$] 1.675 million. This lawsuit followed and ultimately, this Court found that M&G is entitled to $ 2,404,488.97 in damages from CRG Investments.

In November of 2009, M&G commenced this action, by writ of summons, in Allegheny County. M&G asserted claims against multiple defendants. M&G added and asserted claims against Cunningham and CRG in the complaint of August 2010. The case went to trial in October of 2016. At the conclusion of trial, [v]erdict was entered in favor of the Plaintiff and against [CRG] only on counts 3, 4, 5, 6, 8, and 10 of the second amended complaint setting forth[:] Fraud in the Inducement, Violations of California Business and Professions Code, Violations of the Florida Deceptive and Unfair Trade Practices Act, Intentional Misrepresentation, Failure to Disclose/Concealment, and Breach of Covenant of Good Faith and Fair Dealing respectively. A verdict of $ 2,404,488.97 was issued against the Defendant. This Court declined to award punitive damages. This Court heard arguments

on the proposed findings of fact and conclusions of law on December 18, 2017. Thereafter, the parties filed post-trial motions and supplemental briefs on damages up and until March 3, 2019. These were deemed denied after no ruling was issued on the post-trial motions [and] this appeal followed.

Trial Ct. Op., 2/18/20, at 1-4 (unpaginated) (headings, some footnotes, and citations to the record omitted).

We affirm the trial court, for the reasons discussed below.

1.    Statute of Limitations

Appellants Cunningham and CRG argue that M&G's claims for intentional misrepresentation and failure to disclose/concealment are barred by Pennsylvania's two-year statute of limitations, as the claims accrued in October 2007 at the latest, but M&G did not sue Appellants until August 2010.[3] Appellants point out that these are the only claims asserted against them upon which the trial court could have premised a finding of liability. Appellants' Brief at 38.

M&G responds that its August 23, 2010 complaint was timely because its claims did not accrue until it stopped receiving rent payments in February

---

[3] The parties agree that California substantive law governs M&G's claims. *See, e.g.*, Appellants' Brief at 40; M&G's Brief at 29; Trial Ct. Op. at 4. Thus, Pennsylvania's borrowing statute would apply to determine the limitations period for filing claims. *See* 42 Pa.C.S. § 5521(b). The borrowing statute requires that accrual for claims outside of Pennsylvania shall be governed by the shorter of the limitations statute of the jurisdiction in which the claim accrues or our statute. *Id.* Pennsylvania's statute of limitations is the shorter, and thus it governs the claims. *See* 42 Pa.C.S. § 5524(7) (two-year statute for actions founded on negligent, intentional, or otherwise tortious conduct, unless specified elsewhere); Cal. Code Civ. Proc. § 338(d) (three-year statute for action for relief for fraud or mistake).

- 5 -

2010. In the alternative, M&G argues that the discovery rule (and the equitable doctrine of fraudulent concealment) tolled the limitations period, as M&G did not know of Appellants' fraud until later than Appellants assert. M&G characterizes October 2007 as the beginning of its process of uncovering fraud, and not the end-point of reevaluation that Appellants propose. M&G's Brief at 28, 29-37.

The trial court recounts that this claim was rejected at summary judgment, and that Cunningham has acknowledged M&G's receipt of rent through February 2010. Trial Ct. Op. at 10-11. If February 2010 is when the final element arose, and if a cause of action does not accrue until all elements are present, then the August 2010 complaint was timely filed. *Id.* at 11.

This question arises in context of denial of judgment *non obstante veredicto* (JNOV). "When reviewing the propriety of an order denying judgment notwithstanding the verdict, this Court must determine whether there is sufficient competent evidence to sustain the verdict." *Price v. Chevrolet Motor Div. of Gen. Motors Corp.*, 765 A.2d 800, 806 (Pa. Super. 2000) (citation omitted). Evidence will be viewed in the light most favorable to the verdict winner, giving the benefit of every reasonable inference arising therefrom; we will not substitute our own judgment for that of the finder of fact. *Id.* However, questions of law are subject to plenary review. *Id.*

Pursuant to Pennsylvania law, a cause of action accrues when a plaintiff could first maintain the action to successful conclusion. *Osborne v. Lewis*, 59 A.3d 1109, 1114 (Pa. Super. 2012) (*citing Kapil v. Assoc. of Pa. State*

*College and Univ. Faculties*, 470 A.2d 482, 485 (Pa. 1983). This means if one of the elements (to wit, damages) is absent, the cause has not yet accrued.

Appellants have not established, in light of our deferential factual standard of review and the requirement that we view all facts in light most favorable to the verdict winner, that their characterization of the trigger for tolling the statute is the end, rather than the beginning, of the ominous sequence of financial events that led to this litigation. Appellants assert that in October 2007, it should have been "apparent to M&G" that the property "would not have been valued the same as the property it believed it was purchasing." Appellants' Brief at 46. Appellants propose October 2007 as the ripening date, because the restaurant at the Waterfront Property was no longer operated by the subtenant who ran it when the transaction commenced; thus, Appellants argue, by that point M&G should have known that the rental lease value would differ from what M&G had bargained for. Appellants' Brief at 45.

Suspecting that a deal might not consist of all that is promised is not the same as having actionable damages. M&G stopped receiving rent payments in February 2010 and filed its complaint on August 23, 2010. M&G rightfully points out that its complaint would likely have failed at the preliminary objection stage had it been filed while rent was still being paid, citing *Kelly v. St. Mary Hosp.*, 694 A.2d 355, 356 (Pa. Super. 1997) (affirming sustaining preliminary objections where "complaint failed to allege

any damages") and **In re Jacobs**, 936 A.2d 1156, 1165 (Pa. Super. 2007) (damages essential to right to sue); M&G Brief at 31. Thus, this claim fails.[4]

## 2. Sufficiency

Appellants argue that even if Cunningham is responsible for the representations and omissions attributed to him by the trial court, nevertheless the evidence cannot support the trial court's verdict. Appellants assert that M&G was not harmed by any such representations and omissions in the first leg of the transaction, and the evidence does not establish its reliance thereon in the second leg.[5] Appellants' Brief at 54-62. Appellants claim that M&G was completely on notice as to the risks associated with purchasing the Waterfront Property. **Id.** at 59.[6]

---

[4] Because we conclude that the trial court's factual determination as to the triggering of damages warrants our deference, we need not address the argument in the alternative as to tolling of the statute via the discovery rule.

[5] By "first leg" Appellants mean the sale of the San Rafael Office, and the second leg indicates the acquisition of the Waterfront Property. Appellants' Brief at 55-57.

[6] Appellants cite California law establishing that actual knowledge defeats any claim of fraud, as under such circumstances a plaintiff cannot establish reliance. Appellants' Brief at 59, *citing, e.g.,* **Orient Handel v. United States Fid. & Guar. Co.**, 237 Cal. Rptr. 667, 672 (Cal. Ct. App. 1987) ("If the plaintiff having access to the necessary information actually makes an independent investigation which the defendant does not hinder, he will be charged with knowledge of the facts which reasonable diligence would have disclosed, and he cannot claim reliance upon the representations.") (citation omitted). However, the trial court found that M&G **did** rely on material misrepresentations, and that given the fiduciary duty Cunningham bore, such reliance was reasonable. Trial Ct. Op. at 5-8.

M&G argues that the trial court's verdict is supported by ample evidence, including the trial court's findings that "Flynn relied on Cunningham throughout the 1031 transaction" and "acted reasonably when he followed his real estate broker's advice." M&G Brief at 37, *quoting* Trial Ct. Op. at 3, 11. M&G points to facts it asserts the Appellants misconstrue and others it does not address. **Id.** M&G also argues that Appellants, having failed to give this Court a fair summary of the facts in the light most favorable to the judgment below, have disqualified their sufficiency argument. **Id.** at 42-43.

The trial court explains that M&G asserted lost profits under Cal. Civ. Code § 3343(a)(4) based on its claim of fraud in the underlying § 1031 transaction. Trial Ct. Op. at 4.

> (a) One defrauded in the purchase, sale or exchange of property is entitled to recover the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received, together with any additional damage arising from the particular transaction, including any of the following . . .
>
> > (4) [w]here the defrauded party has been induced by reason of the fraud to purchase or otherwise acquire the property in question, an amount which will compensate him for any loss of profits or other gains which were reasonably anticipated and would have been earned by him from the use or sale of the property had it possessed the characteristics fraudulently attributed to it by the party committing the fraud, provided that lost profits from the use or sale of the property shall be recoverable only if and only to the extent that all of the following apply:
> >
> > > (i) The defrauded party acquired the property for the purpose of using or reselling it for a profit.

> (ii) The defrauded party reasonably relied on the fraud in entering into the transaction and in anticipating profits from the subsequent use or sale of the property.
>
> (iii) Any loss of profits for which damages are sought under this paragraph have been proximately caused by the fraud and the defrauded party's reliance on it.

Cal. Civ. Code § 3343(a)(4)(i)-(iii).  To recover under the statute, a plaintiff must have acquired the property for use and to have reasonably relied upon the fraudulent representation; the loss must be the proximate result of the fraud.  **Hartman v. Shell Oil Co.**, 137 Cal. Rptr. 244, 249 (Cal. Ct. App. 1977).

The trial court determined that Cunningham made certain critical representations and omissions, such as Cunningham's failure to disclose that he had known Chris Peters, the principal of Capital Pacific, LLC (the seller, "Capital Pacific"), for approximately six or seven years, and had already purchased two investment properties with Capital Pacific.  Trial Ct. Op. at 6.  Cunningham acknowledged that he had a fiduciary duty to disclose this relationship. *Id.*

"In acquiring the property . . . M&G relied upon the representation of Cunningham as a real-estate broker for the identification and suitability of the Waterfront Property.  Cunningham misrepresented to M&G that the deal was a 'coupon clipper' and that he had previously sold multiple Damon's properties . . . .  Again, this representation was untrue."  Trial Ct. Op. at 6 (footnote omitted).  As it happens, he had conducted one sale involving a Damon's restaurant, a transaction that ended in litigation. *Id.* at 7-8. "Cunningham

himself privately believed that the Damon's restaurant deal presented a greater level of risk and was not safe" but he failed to disclose this, too. *Id.* The *pro forma* profit projection offered to Flynn, which he relied on, had been characterized by the seller as "BS" – yet another critical departure between the primrose path down which Flynn was led and the path to this litigation. M&G Brief at 23.

Under California law, the reasonableness of reliance is a factual question, which entitles the determination at trial to "considerable deference" on appeal. *Orozco v. WPV San Jose, LLC*, 248 Cal. Rptr. 3d 623, 639 (Cal. App. 6th Dist. 2019) (citation omitted). "When a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court begins and ends with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact." *Boeken v. Philip Morris, Inc.*, 26 Cal. Rptr. 3d 638, 652 (Cal. Ct. App. 2005) (citation omitted). Appellate courts must begin with the presumption that the record evidence sufficiently supports the trial court's findings, placing the burden of demonstrating otherwise on the appellant. *Id.*

The tension at the heart of this ill-begotten arrangement arises from Cunningham's prior relationship to Flynn, which gave Flynn the reasonable impression that his friend, who he thought represented **him** in this deal, was looking out for his interests. In fact, although Cunningham told Flynn he would restrict potential deals to those that met Flynn's retirement needs, deals

that would be safe and generate more income than the office he was selling, Cunningham effectively leveraged his friendship with Flynn to secure a higher commission for himself from the buyer – another aspect of the deal he failed to disclose. Trial Ct. Op. at 7. With facts like these, as long as the trial court's conclusion that Cunningham bore a fiduciary duty to Flynn is sound, the evidence is more than ample to support the verdict. Cunningham admitted that he owed a fiduciary duty to Flynn. *Id.* In light of California's deferential appellate standard, we cannot conclude that Appellants have carried their burden.

3.    Verdict Amount

Appellants assert that the verdict should be reduced because it fails to take into account settlements M&G received from joint tortfeasors and includes elements of damage unsupported by the record. Appellants' Brief at 62-73. Appellants cite seven settlements made by other parties, and claim that the Uniform Contribution Among Tort-feasors Act requires a molded verdict taking them into account. *Id.* at 62-63.[7]

M&G replies that the record amply supports the verdict amount, and that in fact, the trial court should have awarded its entire claimed sum of $10.5 million dollars. M&G's Brief at 43-51. Because M&G has taken the position that it would be proper for it to be awarded the entire amount its

---

[7] Appellants argue that Pennsylvania law explicitly governs the known releases, and therefore this Court should apply Pennsylvania's Uniform Contribution Among Tort-feasors Act, 42 Pa.C.S. §§ 8321-8327. Appellants' Brief at 63-64.

damages expert concluded it suffered, it argues that the "right for any reason" doctrine justifies denying any offset or molding based on settlements received from other parties. *Id.* at 43-44. M&G argues that it pursued different theories of liability against other defendants, and that therefore Appellants' molding argument relies on a misleadingly straitened view of M&G's case. *Id.* at 52. M&G also argues waiver, asserting that because Appellants did not include any potential liability for any other party in their proposed findings and conclusions to the trial court, they have surrendered the position that the trial court erred in failing to apportion liability to another party. *Id.* at 50-51.

Further, M&G points out that Appellants' allegations as to settlements are speculative, as they failed to attempt to integrate any outside settlements into the record. "Their request for a remand to develop a record they failed to develop below, when they had every opportunity to do so, should be denied." M&G's Brief at 52.

Appellee Carl Howard, who was minimally involved in the trial litigation but is a potential "other tortfeasor" for purposes of Appellants' molding campaign, asserts that Appellants have waived this argument for failure to abide by certain briefing requirements, specifically Pa.R.A.P. 2116, governing the statements of questions involved, and Pa.R.A.P. 2119(a), governing argument. Howard Brief at 1-3. "Appellants instead have limited their argument regarding their cross-claims to an assertion that the lower court erred by refusing to mold the verdict to account for settlements from other

defendants only, and do not address or identify any specifics with regards to Mr. Howard." *Id.* at 5 (emphasis omitted).

"[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived." *In re A.C.*, 991 A.2d 884, 897 (Pa. Super. 2010) (citation omitted). Where our appellate courts are significantly hampered in efforts to provide meaningful review of an appellate argument because key evidence and arguments are simply absent from the record, such argument is waived for lack of development. *See, e.g., Dep't of Envtl. Prot. v. Green 'N Grow Composting, LLC*, 201 A.3d 282, 286-87 (Pa. Cmwlth. 2018).

Howard's argument casts into stark relief the dilemma Appellants' molding claim poses for this Court.[8] Although Appellants are apparently aware of the dollar amount of some settlements made by other potential defendants, their claim is underdeveloped. It is an enduring challenge to pursue a defense of total refusal of liability while preserving opportunities to point the finger at potential other bad actors; after all, if there was no bad act and the entire

___

[8] To ponder Howard's potential "share" in Appellants' molding claim is to cabin the quandary the claim poses. Howard was alleged to be a principal in a corporate entity known as "Alliance Development Group LLC" or "Alliance Development Group Holdings LLC" which was, or is, an alleged parent company of Damon's Restaurants, Inc. and affiliated entities. Howard Brief at 1. The crux of this case is the relationship between Cunningham and Flynn, and describing Howard's relation to the deal and its rules and equities as "tertiary" might be overselling it – or it might not. On the basis of the record before us, it would be impossible to determine his potential influence over, or role in, the real estate deal and how, and why, it went sour.

transaction was above-board, why would an innocent accused party point at anyone?  However, litigation strategy has consequences, especially when it leads a party to underdevelop portions of the record that may be critical to appellate arguments.  Appellants assert that M&G received "settlement payments from at least five other defendants" and that "[a]lthough the releases with all settled defendants are not part of the record, the release between M&G and Capital Pacific is in the record . . . ."  Appellants' Brief at 63, 64.  This Court is not the place, and appellate litigation not the time, to explore "at least" five potential settlements of unknown sums, based on theories of liability that are unsounded by the trial court.  This explicit admission of an underdeveloped record makes evident that Howard is right; because Appellants failed to attend to completing the record in this nonjury trial, their molding claim cannot prevail.

Appellants also argue that the damages assessment arises from the trial court's misapprehension of the record.  Appellants' Brief at 69-73.  They cite the following breakdown:

- M&G's initial investment in the Waterfront Property: $1,134,488.97;

- Deferral of capital gains taxes from the § 1031 transaction: $350,000;

- the greater amount of rent M&G could have collected from the San Rafael Office if it had been retained ($920,000), or the profit from its sale ($917,969).

Appellants' Brief at 70.  Appellants assert that all three elements of damages are unsupported by the record.  *Id.*  They first argue it was error to award the

entire value of the initial investment in the Waterfront Property, and to fail to account for the rent gained thereby. *Id.*

Next, Appellants argue that there was no basis for an award for deferral of capital gains tax, because at the time of trial, those taxes were still unpaid. Appellants' Brief at 70. They argue both that those damages were not incurred at all, and that M&G's damages "would have been limited to its loss from having to pay the taxes earlier," an amount that M&G did not quantify. *Id.* at 71.

Third, Appellants fault the trial court for concluding that M&G was entitled to profit from the sale of the San Rafael Office as damages because M&G received that money. Appellants also assert that the actual profit was $1,850,000, not $917,969. Appellants' Brief at 71.

Finally, Appellants argue that the $920,000 in lost rent that the trial court calculated M&G could have collected if it had retained the San Rafael Office is unsupportable as damages under the trial court's stated reasoning. Appellants' Brief at 72. Appellants state that such damages are awardable under Cal. Civ. Code § 3343(a)(3) but not (a)(4), as the trial court has it. *Id.* Further, Appellants assert that M&G did not structure its own assessment of its damages this way, instead basing its calculation on cash flows from the Waterfront Property, a theory the trial court rejected. *Id.*

M&G responds first by asserting again that it is entitled to the entire amount its expert outlined: $10,500,000. M&G's Brief at 44. M&G agrees with the trial court's application of Cal. Civ. Code § 3343(a)(4). *Id.* at 45-46.

We begin with an examination of allowable damages in California where a real estate broker breaches a fiduciary duty and commits fraud. The statute cited by the trial court, Cal. Civ. Code § 3343, codifies the "out of pocket" rule, with the goal of "restoring the plaintiff to the financial position enjoyed by him prior to the fraudulent transaction, and thus awards the difference in actual value at the time of the transaction between what the plaintiff gave and what he received." *Stout v. Turney*, 586 P.2d 1228, 1232 (Cal. 1978). The out of pocket rule "has not prevented the courts from in many cases fashioning relief appropriate to particular circumstances in which a limitation to strict out-of-pocket recovery would lead to injustice" and thus "a clear exception has emerged in cases involving fraudulent Fiduciaries." *Id.* "The courts also gave a liberal construction to the "additional damage" language . . . which was held to comprehend actual expenditures of time and money in reliance on a misrepresentation . . . ." *Id.* In response to these gestures by the courts, California's Legislature expanded the portion of Section 3343 dealing with consequential or "additional" damages, incorporating case law addressing lost time and money expended in reasonable reliance, and amending Section 3343 to permit recovery of lost profits. *Id.* Subsequent cases applying Sections 3333 and 3343 have taken an expansive view of the courts' power to craft damages awards: "[t]he measure of damages for a real estate broker's intentional misrepresentation to a buyer for whom he acts as agent is not limited to the out-of-pocket losses suffered by the buyer[; b]ecause the broker is a fiduciary, damages for intentional fraud may be measured by the broader

- 17 -

benefit-of-the-bargain rule." *Fragale v. Faulkner*, 1 Cal. Rptr. 3d 616, 618 (Cal. Ct. App. 2003). "California law is committed to the view that the fraudulent breach of fiduciary duty is a tort, and the faithless fiduciary is obligated to make good the full amount of the loss of which his breach of faith is a cause." *Pepitone v. Russo*, 134 Cal. Rptr. 709, 711 (Cal. Ct. App. 1976) (citations omitted).[9]

Despite the trial court's findings as to Cunningham's breach of his fiduciary duty and multiple misrepresentations and critical omissions, its damages calculation, which focuses on foregone rent at the San Rafael Office, capital gains taxes, and cost of the Waterfront Property, plainly focuses on unwinding the transaction rather than forcing Appellants to fulfill its false promise.

Thus, we conclude that California's applicable law, especially when applied to a fraudulent real estate transaction where the bad actor was not merely a seller but a fiduciary, permits a damages calculation of broader scope than the one the trial court applied here. Regardless of Appellants' understanding of how the damages award was crafted, *Stout*, *Fragale*, and *Pepitone* would seem to permit a figure much closer to the one proposed by

---

[9] *See also* Laurence A. Steckman et al., *The Availability of Benefit of the Bargain Expectancy-Based Damages for Buyers Defrauded in California Real Estate Transactions*, 31 Touro L. Rev. 1043, 1047 (2015) ("California cases have upheld a broad range of expectancy-based remedies in cases involving the sale of California real estate that do not follow the jury instruction computation, decisions attempting to put fiduciary-injured plaintiffs in economic positions they would have been in, but for the fraud at issue.").

M&G's damages expert, who based his calculations on projected rents at the Waterfront Property, as opposed to the trial court's comparatively confined calculation which instead focuses on releasing M&G from the full brunt of this fraudulent deal to a reasonable extent.[10]

Because we conclude that applicable California law permitted a much broader and more searching damages calculation, one consistent not just with making M&G whole to the extent its damages were reasonably anticipated but with disincentivizing fraudulent fiduciaries, we decline to award relief as to this claim.

4.    Abandoned Claims

Appellants argue that the trial court erred in assigning liability for claims M&G either abandoned or failed to assert against them, as reported in the trial court's opinion, which states that "[v]erdict was entered in favor of [M&G] and against [CRG] only on counts 3, 4, 5, 6, 8, and 10 of the second amended complaint [for] Fraud in the Inducement, Violations of California Business and Professions Code, Violations of the Florida Deceptive and Unfair Trade Practices Act, Intentional Misrepresentation, Failure to Disclose/Concealment, and Breach of Covenant of Good Faith and Fair Dealing respectively." Trial Ct. Op. at 3. Appellants take the position that only intentional misrepresentation

---

[10] *See* Plaintiff's Exh. JJ, Lally & Co., LLC, Assessment of Economic Loss (October 18, 2016) (calculating static and dynamic models of loss assessment, based on past and future lost cash flows and lost equity value, and arriving at a static estimate of $10,586,170 in losses and a dynamic estimate of $10,589,316 in losses, as of September 30, 2016).

and failure to disclose/concealment were preserved for verdict. Appellants' Brief at 73-76.

The trial court plainly based its damages assessment on several key bodies of evidence adduced at trial, including M&G's damages expert's report and testimony (though the verdict represents only a fraction of the damages claimed therein). Whether the theories by which the trial court found itself empowered to assess damages are many or few, its damages assessment arises from its fundamental recognition that under California law, compensatory damages are awarded when a plaintiff establishes fraud in a transaction of this type. Trial Ct. Op at 4, citing Cal. Civ. Code § 3343(a)(4)(i)-(iii). Just as there are many roads to Rome, there are many articulable theories by which fraud may be outlined. One still arrives in Rome. Further, Appellants have not established how this argument might modify the verdict entered on December 5, 2018. While Appellants assert that this argument entitles them to relief because there is insufficient evidence to sustain the verdict as to the two theories they acknowledge to have been preserved for trial (*see* Appellants' Brief at 76), we have rejected Appellants' sufficiency argument, and Appellants do not articulate any other reason why the mathematics supporting the damages assessed against them would be altered in any way by this alleged error. Therefore we decline to grant relief.

Judgment affirmed.

Judge Murray joins this Memorandum.

Judge Olson concurs in the result.

- 20 -

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date:  2/22/2021